# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

FRIENDS OF ALASKA NATIONAL
WILDLIFE REFUGES, *et al.*,

            Plaintiffs,

    v.

DAVID BERNHARDT, in his official
capacity as Acting Secretary of the U.S.
Department of the Interior, *et al.*,

            Defendants,

    and

KING COVE CORPORATION, *et al.*,

            Intervenor-Defendants.

Case No. 3:18-cv-00029-SLG

## ORDER RE MOTION FOR SUMMARY JUDGMENT

Before the Court at Docket 50 is Plaintiffs Friends of Alaska National Wildlife

Refuges; The Wilderness Society; National Audubon Society; Wilderness Watch;

Center for Biological Diversity; Defenders of Wildlife; National Wildlife Refuge

Association; Alaska Wilderness League; and the Sierra Club's ("Plaintiffs'") motion

for summary judgment. Defendants Ryan Zinke — later replaced by David

Bernhardt[1] — U.S. Department of the Interior; and U.S. Fish and Wildlife Service

---

[1] "David Bernhardt serves as Acting Secretary of the U.S. Department of the Interior." *David Bernhardt - Acting Secretary of the Interior*, U.S. DEP'T OF THE INTERIOR, [https://perma.cc/7WRR-5CKU]; *see also* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.").

("Federal Defendants") opposed at Docket 65. Intervenor-Defendants King Cove Corporation; Agdaagux Tribal Council; Aleutians East Borough; City of Cold Bay; City of King Cove; and Native Village of Belkofski ("Intervenor-Defendants") opposed at Docket 66. Amicus Curiae State of Alaska filed a brief in opposition to Plaintiffs' motion at Docket 70. Plaintiffs replied in support of their motion at Docket 71. Oral argument was not requested by any party and was not necessary to the Court's decision.

## BACKGROUND

The Izembek National Wildlife Refuge ("Izembek") is a 311,000-acre refuge that was established in 1980 as part of the Alaska National Interest Lands Conservation Act ("ANILCA").[2] The Department of the Interior ("DOI") manages the refuge through the Fish and Wildlife Service ("Service").[3] The City of King Cove ("King Cove") and the City of Cold Bay ("Cold Bay") are small communities located approximately 18 miles apart and in close proximity to Izembek.[4] Cold Bay

---

[2] See Pub. L. 96-487, Title III, § 303(3), 94 Stat. § 2371, 2390–91 (1980); U.S. Fish & Wildlife Serv., Statistical Data Tables for Fish & Wildlife Service Lands (as of 9/30/2018) 11, [https://perma.cc/S8WR-CQFZ].

[3] See 16 U.S.C. § 668dd(a)(1).

[4] AR DOI 35 (Assessment of Non-Road Alternatives). King Cove has approximately 800 year-round residents, but the population expands to approximately 1,300 residents when the city's seafood processing plant is operating at full capacity. Id. Cold Bay has approximately 108 residents. See Annual Estimates of the Resident Population, U.S. CENSUS BUREAU, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed February 18, 2019).

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 2 of 31

is home to the only all-weather airport in the vicinity of King Cove.[5] Both King Cove and Cold Bay are accessible only by air and sea.[6]

While King Cove and Cold Bay are only 18 miles apart, frequent severe weather makes it difficult for King Cove residents to travel to Cold Bay by sea or air.[7] Accordingly, "[r]esidents of the King Cove community have long desired and advocated for a road as the only safe, reliable and affordable means of year-round access to Cold Bay and its all-weather airport."[8] However, a road between the two communities would have to pass through lands that are currently part of Izembek.[9] DOI and the Service have evaluated the effect of such a road several times in the past. In the early 1980s, DOI conducted a road analysis as part of a regional planning effort and concluded that a road would negatively affect both local wildlife and subsistence uses.[10] The Service conducted another road analysis in 1996,

---

[5] AR DOI 35.

[6] *See* AR DOI 902 (Map).

[7] AR DOI 35.

[8] AR DOI 411 (Dean Gould letter).

[9] *See* AR DOI 902.

[10] AR 4587–90, 9038.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 3 of 31

and again found that a road through Izembek would have adverse environmental impacts.[11]

In 1998, Congress passed the King Cove Health and Safety Act of the Consolidated and Emergency Supplemental Appropriations Act of 1999.[12]  The Act appropriated funds to purchase a hovercraft to travel between King Cove and Cold Bay, construct a road to the hovercraft terminal, and improve King Cove's airstrip and health clinic.[13]  The hovercraft operated between 2007 and 2010, but the Aleutians East Borough ultimately suspended hovercraft services, citing unreliability and cost.[14]

In 2009, Congress again sought to address King Cove's transportation concerns.  In the Omnibus Public Land Management Act of 2009 ("OPLMA"), Congress directed the Secretary to determine whether a land exchange and road construction within Izembek would be in the public interest.[15]  The proposed exchange would have transferred a corridor of Izembek land to the State of Alaska "for the purpose of constructing a single-lane gravel road between the communities

---

[11] AR DOI 9036–43.  A third study analyzing potential impacts of a road was completed in 1998. AR 10380.  The contents of this study, however, do not appear to be included in the record in this case.

[12] *See* Pub. L. No. 105-277, § 353, 112 Stat. 2681, 2681-302–03 (1998).

[13] Pub. L. No. 105-277, § 353, 112 Stat. 2681, 2681-302–03 (1998).

[14] AR DOI 6.

[15] Pub. L. No. 111-11, Title VI, Subtitle E, 123 Stat. 991, 1177–83 (2009).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 4 of 31

of King Cove and Cold Bay, Alaska."[16]  With limited exceptions, use of the road would have been restricted "primarily [to] health and safety purposes (including access to and from the Cold Bay Airport) and only for noncommercial purposes."[17]  The Act required a determination by the Secretary that the exchange was in the public interest in order to authorize construction of the road.[18]  OPMLA also directed the Secretary to "initiate the preparation of an environmental impact statement" analyzing the proposed exchange and the potential construction and operation of a road, as "required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)."[19]

In February 2013, DOI issued the Final Environmental Impact Statement ("EIS") required by the OPMLA.[20]  The EIS evaluated the effects of the proposed land exchange and the effects of several alternatives to the exchange.[21]  The EIS concluded that a land exchange and construction of a road "would have major

---

[16] Pub. L. No. 111-11, Title VI, Subtitle E, § 6402(a), 123 Stat. at 1178.

[17] Pub. L. No. 111-11, Title VI, Subtitle E, § 6403(a)(1), 123 Stat. at 1180.

[18] Pub. L. No. 111-11, Title VI, Subtitle E, § 6402(d)(1), 123 Stat. at 1179.

[19] Pub. L. No. 111-11, Title VI, Subtitle E, § 6402(b)(2)(a), 123 Stat. at 1178–79.

[20] AR 180523–181596.

[21] See, e.g., AR DOI 180908, 180916–26.

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 5 of 31

adverse effects to birds and land mammals" and "would diminish the ability of the Service to meet" several of the purposes of Izembek.[22]

In December 2013, the Secretary released a 20-page Record of Decision ("ROD") concluding that the proposed road would not be in the public interest.[23] The ROD explained that construction of a road "would lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands to be received under an exchange," and that "reasonable and viable transportation alternatives exist to meet the important health and safety needs of the people of King Cove."[24] The ROD "identifie[d] all alternatives considered" and "specifie[d] the alternatives that were considered to be environmentally preferable."[25] These included use of a hovercraft, a landing craft, or a ferry to facilitate travel between King Cove and Cold Bay.[26] In light of the Secretary's desire to "protect[] the unique resources" of Izembek, the ROD adopted the "no action" alternative from the EIS, which "decline[d] the offered land exchange for road construction."[27] King Cove submitted a request for

---

[22] AR 180930.

[23] AR DOI 3 (2013 ROD).

[24] AR DOI 3.

[25] AR DOI 2.

[26] AR DOI 11, 14–15, 20.

[27] AR DOI 2, 20.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 6 of 31

reconsideration, but the Secretary denied the request.[28]   King Cove then challenged the Secretary's decision in this Court; the Court granted the federal government's motion for summary judgment.[29]

Following the 2016 Presidential election, the new Secretary pledged his commitment to work on the land exchange issue with King Cove Corporation.[30]   In early 2017, King Cove Corporation formally requested that DOI agree to an exchange to facilitate construction of a road between King Cove and Cold Bay.[31] On January 22, 2018, the Secretary entered into an Agreement for the Exchange of Lands ("Exchange Agreement") with King Cove Corporation.[32]   The Agreement commits the federal government and King Cove to an equal value exchange whereby King Cove will convey the surface estate of certain lands within the exterior boundaries of Izembek and the Alaska Peninsula National Wildlife Refuge to the United States — and relinquish selection rights under ANCSA to additional

---

[28] AR DOI 23–24.

[29] *See Agdaagux Tribe of King Cove, et al. v. Jewell, et al.*, Case No. 3:14-cv-0110-HRH (D. Alaska).  King Cove appealed the decision to the Ninth Circuit, but voluntarily dismissed the case when the Secretary agreed to explore a land exchange in 2017.  *Agdaagux Tribe of King Cove v. Zinke*, No. 15-35875 (9th Cir. Aug. 10, 2017) (Mot. to Voluntarily Dismiss Appeal) (ECF No. 62); *Agdaagux Tribe of King Cove v. Zinke*, 2017 WL 5198384, No. 15-35875 (9th Cir. Aug. 11, 2017) (Order) (ECF No. 65).

[30] AR DOI 265–66 (Jan. 17, 2017 Confirmation Hearing Transcript) ("You have my absolute commitment that I will restore trust and work . . . on [the land exchange] issue because it is important.").

[31] AR DOI 410–12.

[32] AR DOI 887 (Exchange Agreement).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 7 of 31

Izembek lands — in exchange for a corridor of land through the Izembek refuge.[33] When the location of the corridor is finalized, the precise number of acres to be conveyed to the United States will be adjusted to ensure an equal-value exchange.[34] The Exchange Agreement states that the road is to be "used primarily for health, safety, and quality of life purposes (including access to and from the Cold Bay Airport)."[35]

On January 31, 2018, Plaintiffs filed the Complaint that initiated this suit.[36] Plaintiffs filed an Amended Complaint on April 19, 2018.[37] The Amended Complaint is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–06, and alleges that the Exchange Agreement violates four federal laws: (1) Section 1302 of ANILCA, 16 U.S.C. § 3192; (2) Title IX of ANILCA, 16 U.S.C. §§ 3161–3173; (3) the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370(h); and (4) the Endangered Species Act, 16 U.S.C. §§ 1531–1544.[38] Plaintiffs seek "vacatur, declaratory, and injunctive relief because the land

---

[33] AR DOI 887–90.

[34] AR DOI 889–90.

[35] AR DOI 889.

[36] Docket 1.

[37] Docket 32.

[38] Docket 32 at 2–3, ¶¶ 3, 5.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 8 of 31

exchange decision is arbitrary, capricious, an abuse of discretion, and not in accordance with the law."[39]

On July 11, 2018, Plaintiffs filed the instant motion for summary judgment.[40]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[41]

## STANDARD OF REVIEW

"[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."[42] "In reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'"[43]

The APA instructs a reviewing court to "hold unlawful and set aside agency action, findings, or conclusions" if they are "arbitrary, capricious, an abuse of

---

[39] Docket 32 at 2, ¶ 4.

[40] Docket 51.

[41] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[42] *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

[43] *Id.* (quoting *Occidental*, 753 F.2d at 770).

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 9 of 31

discretion, or otherwise not in accordance with law."[44]   An agency's action is arbitrary and capricious when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[45]

## DISCUSSION

### 1. Plaintiffs have standing to challenge the Exchange Agreement and the Exchange Agreement is ripe for judicial review.

Intervenor-Defendants contend that Plaintiffs have not established standing to contest the land exchange.[46]   They further contend that the case is not ripe for consideration.[47]

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."[48]   Intervenor-Defendants contend that Plaintiffs have not

---

[44] 5 U.S.C. § 706(2).

[45] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[46] Docket 66 at 15–18.

[47] Docket 66 at 18–20.

[48] *Martin v. City of Boise*, 902 F.3d 1031, 1040 (9th Cir. 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is certainly impending."  *Id.* (quoting *Clapper*, 568 U.S. at 409).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 10 of 31

satisfied any of these requirements. First, they contend that "[c]onstruction of the road is neither 'concrete' nor imminent — it would require full financing and permitting and authorizations from state and federal agencies other than the Secretary's agency."[49] The Court recently considered a similar argument in *League of Conservation Voters v. Trump*.[50] In *League*, the federal defendants contended that the plaintiff environmental group lacked standing to challenge an Executive Order reversing a prior Executive Order that withdrew certain coastal areas in the Arctic's Beaufort and Chukchi Seas from oil and gas leasing.[51] The defendants contended that "because there are multiple steps to obtaining leases and drilling permits in the Arctic and Atlantic Oceans, there [was] no risk of imminent harm" to the plaintiffs.[52] The Court rejected this argument, instead concluding that the "Executive Order's clear intent to expedite energy production in the Arctic and Atlantic Oceans, the oil industry's eagerness to obtain seismic surveying permits, and the fact that seismic surveying typically precedes oil and gas lease sales, together indicate that Plaintiffs have adequately alleged a substantial risk of harm from the passage of Executive Order 13795 that is 'imminent' for purposes of Article III standing."[53] Similar reasoning applies here. It

---

[49] Docket 66 at 17.

[50] 303 F. Supp. 3d 985 (D. Alaska 2018).

[51] *Id.* at 991.

[52] *Id.* at 996.

[53] *Id.* at 999; *see also In re Zappos.com, Inc.*, 888 F.3d 1020, 1027–28 (9th Cir. 2018)

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 11 of 31

is undisputed that the land exchange is intended to facilitate construction of a road; furthermore, as Plaintiffs note, the parties involved in the Exchange Agreement have "expressed their intent to obtain all necessary permits and construct the road."[54] Plaintiffs thus have alleged "a substantial risk of harm . . . that is 'imminent' for purposes of Article III standing."[55]

Intervenor-Defendants' other challenges to Plaintiffs' standing are similarly unavailing. First, they allege that there "is no causal connection between the Plaintiffs' allegations of harm arising from road construction" and the land exchange.[56] As noted above, however, the Secretary promulgated the Exchange Agreement in order to facilitate construction of a road. Second, Intervenor-Defendants assert that Plaintiffs' injuries would not be redressed by setting aside the Exchange Agreement, because "the real estate transaction authorized by the Agreement will have no effect upon the physical environment in the Refuge."[57] Again, the Exchange Agreement would transfer Izembek lands to King Cove Corporation for the express purpose of facilitating construction of a road. Intervenor-Defendants also maintain that Plaintiffs assert only a "generally

---

(concluding that plaintiffs had a sufficient risk of future harm when they alleged that hackers had stolen their personal information from Zappos's servers, but their personal information had not yet been used by hackers and they had not yet incurred financial harm).

[54] Docket 71 at 11; *see, e.g.*, AR DOI 394–95, 866–67.

[55] *League*, 303 F. Supp. 3d at 999.

[56] Docket 66 at 17.

[57] Docket 66 at 17–18.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 12 of 31

available grievance."[58]   However, Plaintiff organizations have adequately alleged "specific harms to their members' use and enjoyment of protected Izembek lands."[59]

Intervenor-Defendants also argue that Plaintiffs' case is not ripe for consideration.[60]   "When addressing the sufficiency of a showing of injury-in-fact grounded in potential future harms, Article III standing and ripeness issues often 'boil down to the same question.'"[61]   "In that context, 'ripeness can be characterized as standing on a timeline,' and the analysis for both standing and ripeness is essentially the same."[62]   For the reasons discussed above, Plaintiffs have adequately alleged an injury in fact. Furthermore, "[p]rudential considerations of ripeness are discretionary."[63]   In light of the Court's "virtually unflagging" obligation to hear and decide cases, the Court declines to refuse to adjudicate this case on prudential grounds.[64]

---

[58] Docket 66 at 18 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 (1992)).

[59] Docket 71 at 11; *see, e.g.*, Docket 32 at 6, ¶ 17 ("Friends' staff, members, and supporters have visited Izembek, enjoyed viewing its wildlife, and experienced the Wilderness and habitat that Izembek provides.").

[60] Docket 66 at 18–20.

[61] *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014), *as amended* (Sept. 2, 2014) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014)).

[62] *Id.* (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). (en banc)).

[63] *Thomas*, 220 F.3d at 1142.

[64] *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014) (citations omitted).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 13 of 31

For the foregoing reasons, the Court will consider the merits of Plaintiffs' arguments.

### 2. The Secretary did not comply with the APA standard for a policy change.

Plaintiffs contend that the Exchange Agreement must be vacated because the Secretary "not only failed to provide the required level of detailed justification for reversing decades of prior findings, he provided no justification at all."[65] Plaintiffs note that the previous Secretary had found that declining to construct a road would "best accomplish[] the mission of the Service and the goals of Congress in ANILCA"; that Izembek "would be irretrievably damaged by construction and operation of the proposed road"; that there were viable alternatives to a road that would protect King Cove residents' health and safety; and that the harmful effects of construction of a road "would not be offset by the protection of other lands to be received under an exchange."[66] Plaintiffs contend that the Exchange Agreement "ignores or countermands [the Service's] earlier factual findings without reasoned explanation for doing so" and should be set aside on that basis.[67]

As a threshold matter, the Court notes that Plaintiffs advance this argument in the section of their brief alleging that the Exchange Agreement "does not further

---

[65] Docket 51 at 37.

[66] Docket 51 at 18, 36 n.186, 37; Docket 71 at 21; *see* AR DOI 2–3, 10–11, 20.

[67] Docket 51 at 37 n.196, 39 (citing *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956,

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 14 of 31

the purposes of ANILCA in violation of Section 1302 [of ANILCA]."[68]  However,

whether the Exchange Agreement is permissible under ANILCA and whether the

Secretary "failed to provide the required level of detailed justification" for a policy

change are distinct (albeit related) issues.  In *FCC v. Fox Television Stations, Inc.*,

the United States Supreme Court considered whether the FCC's decision to begin

treating isolated uses of non-literal profanity in television broadcasts as indecency

constituted an arbitrary and capricious policy change.[69]  Previously, the FCC had

"distinguish[ed] between literal and nonliteral uses of offensive words, requiring

repetitive use to render only the latter indecent."[70]  The Court concluded that this

policy change did not violate the APA.[71]  The Court identified four factors in

reaching this conclusion, including whether the agency showed that "the new

policy is permissible under the statute" and whether the agency provided "good

reasons" for the new policy.[72]  *Fox* therefore instructs that whether the Exchange

Agreement is "permissible" under Section 1302 of ANILCA and whether the

---

966 (9th Cir. 2015)); *see* Docket 51 at 24.

[68] Docket 51 at 31–39.

[69] 556 U.S. 502, 508–10 (2009).

[70] *Id.* at 517.

[71] *Id.* at 530.

[72] *Id.* at 515.

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 15 of 31

Secretary provided "good reasons" for the policy change are distinct inquiries — and that a failure to satisfy either requirement would violate the APA.[73]

Plaintiffs' contention that the Secretary impermissibly "ignore[d] or countermand[ed] [the Secretary's] earlier factual findings without reasoned explanation for doing so" implicates a line of cases addressing what is required under the APA when an agency reverses its course.[74] In *Motor Vehicle Manufacturers of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, Congress had directed the Secretary of Transportation to issue regulations that would "'meet the need for motor vehicle safety.'"[75] The National Highway Traffic Safety Administration responded by issuing a regulation that required cars to have airbags or detachable seatbelts, finding that both technologies would be "effective" means of "achieving the goal of occupant crash protection."[76] Following a change in Presidential administration, however, the agency rescinded that regulation, based on its finding that "detachable automatic belts will not attain anticipated safety benefits because so many individuals will detach the mechanism."[77] The agency made this finding without addressing its

---

[73] *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (citing *Fox*, 556 U.S. at 515–16).

[74] Docket 51 at 37 n.196, 39 (citing *Kake*, 795 F.3d at 966).

[75] 463 U.S. 29, 33 (1983) (quoting 15 U.S.C. § 1392(a)).

[76] *Id.* at 47.

[77] *Id.* at 47–48.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 16 of 31

previous findings.[78]  The United States Supreme Court held that the agency had

not "cogently explain[ed]" its policy change:

> Given the effectiveness ascribed to airbag technology by the agency, the mandate of the Safety Act to achieve traffic safety would suggest that the logical response to the faults of detachable seatbelts would be to require the installation of airbags. At the very least this alternative way of achieving the objectives of the Act should have been addressed and adequate reasons given for its abandonment. But the agency not only did not require compliance through airbags, it did not even consider the possibility in its 1981 rulemaking.  Not one sentence of its rulemaking statement discusses the airbags-only option.[79]

Accordingly, the United States Supreme Court found the agency's rescission

arbitrary and capricious.[80]

In *FCC v. Fox Television Stations, Inc.*, the Supreme Court again considered

the application of the APA to agency policy changes.[81]  As noted above, *Fox*

addressed a change in the FCC's treatment of isolated uses of non-literal

---

[78] *Id.* at 48.

[79] *Id.*; *see also id.* ("There are no findings and no analysis here to justify the choice made, no indication of the basis on which the [agency] exercised its expert discretion.  We are not prepared to and the Administrative Procedure Act will not permit us to accept such . . . practice. . . .  Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion.'" (emphasis in original) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 167 (1962))).

[80] *Id.* at 46–51.  Because the Court did not "accept all of the reasoning of the Court of Appeals," the Court "vacate[d] the judgment of the Court of Appeals and remand[ed] the case to that court with directions to remand the matter to the NHTSA for further consideration consistent with this opinion."  *Id.* at 57.

[81] 556 U.S. 502 (2009).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 17 of 31

profanity.[82]  The *Fox* court held that the FCC's decision to classify such uses as indecency did not constitute an impermissible policy change; accordingly, the Court reversed a Second Circuit decision vacating an agency order finding two broadcasts actionably indecent.[83]  The *Fox* court explained that *State Farm* did not hold or imply "that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance."[84]  The Court then held "that a policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'"[85]  Applying this standard to the FCC's new enforcement policy, the Court concluded that the agency's order was not arbitrary or capricious.  The Court noted that the FCC "forthrightly acknowledged that its recent actions ha[d] broken new ground, taking account of inconsistent 'prior Commission and staff action' and explicitly disavowing them as

---

[82] *Id.* at 508–10.

[83] *Id.* at 530.

[84] *Id.* at 514.

[85] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fox*, 556 U.S. at 515–16).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 18 of 31

'no longer good law.'"[86]  The Court then examined the FCC's rationale for the policy change and concluded that "the agency's reasons for expanding the scope of its enforcement activity were entirely rational."[87]

Concurring in part and concurring in the judgment, Justice Kennedy noted that *Fox* "[did] not raise the concerns addressed in *State Farm*" because the agency reversal examined in *Fox* was not "base[d] . . . on factual findings," but rather on its reading of Supreme Court precedent.[88]  In contrast, in *State Farm*, the Court had "found the agency's rescission arbitrary and capricious because the agency did not address its prior factual findings."[89]  Citing *State Farm*, Justice Kennedy asserted that "an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so."[90]

In *Organized Village of Kake v. United States Department of Agriculture*, the Ninth Circuit "explore[d] the kind of 'reasoned explanation' necessary to justify a

---

[86] *Fox*, 556 U.S. at 517 (citation omitted).

[87] *Id.* at 517–18; *see also id.* ("It was certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent.  As the Commission said with regard to expletive use of the F–Word, 'the word's power to insult and offend derives from its sexual meaning.'  And the Commission's decision to look at the patent offensiveness of even isolated uses of sexual and excretory words fits with the context-based approach we sanctioned in [*F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 750 (1978)]." (citations omitted)).

[88] *Id.* at 538 (2009) (Kennedy, J., concurring).

[89] *Id.* at 538 (Kennedy, J., concurring).

[90] *Id.* at 537 (Kennedy, J., concurring).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 19 of 31

policy change that rested on changed factual findings" under *Fox*.[91]  The *Kake* court considered whether a 2003 Record of Decision regarding road access in the Tongass National Forest located in southeast Alaska constituted an impermissible agency reversal.[92]  The 2003 Record of Decision concluded that "the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits" of a "Roadless Rule"; in contrast, a 2001 Record of Decision had concluded that "the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to [southeast Alaska] communities."[93]  The *Kake* court concluded that "the 2003 ROD complie[d] with three of the *Fox* requirements":

> First, the Department displayed "awareness that it is changing position."  The 2003 ROD acknowledges that the Department rejected the Tongass Exemption in 2001 and recognizes that it is now "treating the Tongass differently."  Second, the 2003 ROD asserts that "the new policy is permissible" under the relevant statutes, ANILCA and TTRA. Third, we assume the Department "believes" the new policy is better because it decided to adopt it.[94]

The *Kake* court held, however, that the 2003 ROD did not comply with the fourth *Fox* requirement — that is, it did not give "good reasons" for adopting the new

---

[91] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (citing *Fox*, 795 U.S. at 538 (Kennedy, J., concurring)).

[92] *Id.* at 967.

[93] *Id.* (alteration in original).

[94] *Id.* (citations omitted) (quoting *Fox*, 556 U.S. at 515).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 20 of 31

policy.[95]  In rejecting the 2003 ROD, the *Kake* court held that "[t]he 2003 ROD did not simply rebalance old facts to arrive at the new policy.  Rather, it made factual findings directly contrary to the 2001 ROD and expressly relied on those findings to justify the policy change."[96]  The Circuit Court further "held that unexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA."[97]  Because the agency had not offered "a reasoned explanation for disregarding [its] previous factual findings," the Circuit Court concluded that the 2003 Record of Decision violated the APA and affirmed the district court's order vacating the agency's action and reinstating the application of the 2001 Roadless Rule to the forest.[98]

Here, the Secretary has entered into an Exchange Agreement to facilitate construction of a road through Izembek after previously concluding that such a road would not be in the public interest.  Like the agency actions at issue in *State Farm*, *Fox*, and *Kake*, the Secretary's 2018 Exchange Agreement constitutes a policy change from the previous Secretary's 2013 ROD.[99]  The central issue thus

---

[95] *Id.* at 967–68.

[96] *Id.* at 968; *see id.* ("The 2001 ROD explicitly found that wholly exempting the Tongass from the Roadless Rule and returning it to management under the Tongass Forest Plan 'would risk the loss of important roadless area values,' and that roadless values would be 'lost or diminished' even by a limited exemption.  The 2003 ROD found in direct contradiction that the Roadless Rule was 'unnecessary to maintain the roadless values,' and 'the roadless values in the Tongass are sufficiently protected under the Tongass Forest Plan.'" (citations omitted)).

[97] *Id.* at 969.

[98] *Id.* 969–70.

[99] Federal Defendants do not dispute Plaintiffs' characterization of the Secretary's decision as

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 21 of 31

involves whether the Secretary complied with the APA standard for making such a change.

The Secretary's rationale for the Exchange Agreement is articulated in the two-page "Recitals" section at the beginning the agreement.[100] The section cites the existence of "an approximate 12-mile gap between the road leading out of King Cove and the road to the Cold Bay airport"; the fact that inclement weather regularly prevents King Cove residents from reaching Cold Bay; the fact that "there have been 68 medical evacuations (medevac) from King Cove since December 23, 2013, including 17 by the U.S. Coast Guard, because commercial medevac carriers determined that it was too dangerous to fly into King Cove"; the fact that King Cove residents "have died attempting to travel to and from King Cove or Cold Bay and from being unable to get from King Cove to the Cold Bay airport for medevac transport to Anchorage"; and the fact that the Exchange Agreement would allow the Service to acquire lands that had been "identified by the . . . Service for future acquisition if such lands became available."[101] The section also states that past Congressional legislation "has not produced a solution satisfactory to the needs of King Cove residents."[102]

---

an "agency reversal." *See* Docket 65 at 25.

[100] AR DOI 887–88.

[101] AR DOI 887–88.

[102] AR DOI 888.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 22 of 31

The Exchange Agreement does not address or acknowledge the 2013 ROD and its contrary findings. This omission suggests that the Secretary did not comply with two of the requirements for a policy change articulated in *Fox*. First, the Secretary did not display "awareness that [he was] changing position."[103] In *Fox*, the Supreme Court held that the FCC complied with this requirement where "the Commission forthrightly acknowledged that its recent actions ha[d] broken new ground, taking account of inconsistent 'prior Commission and staff action' and explicitly disavowing them as 'no longer good law.'"[104] Similarly, in *Kake*, the Circuit Court held that the Department of Agriculture displayed "awareness that it is changing position" because "The 2003 ROD acknowledge[d] that the Department rejected the Tongass Exemption in 2001 and recognize[d] that it is now 'treating the Tongass differently.'"[105] In contrast, the Exchange Agreement does not acknowledge that the Secretary's action constitutes a departure from the agency's prior policy for Izembek.

In addition, by failing to address the 2013 ROD, the Secretary impermissibly "discard[ed] prior factual findings without a reasoned explanation."[106] In the 2013 ROD issued pursuant to OPMLA, the previous Secretary had concluded that while

---

[103] *Kake*, 795 F.3d at 966 (quoting *Fox*, 556 U.S. at 515).

[104] *Fox*, 556 U.S. at 517.

[105] Kake, 795 F.3d at 967 (emphasis omitted) (quoting *Fox*, 556 U.S. at 515).

[106] *Kake*, 795 F.3d at 968.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 23 of 31

"the proponents of the proposed road believe it would be a reliable method of transport in most weather conditions . . . other viable, and at times preferable, methods of transport remain and could be improved to meet community needs."[107] The previous Secretary had also found that "construction of a road through the Izembek National Wildlife Refuge would lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands to be received under an exchange."[108] The Exchange Agreement contains "[n]ot one sentence" discussing these previous findings.[109] While an agency is certainly permitted to rebalance relevant factors to arrive at a new policy, "*Kake* and *State Farm* make clear . . . that 'even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation.'"[110] But that is what happened here. The Secretary's failure

---

[107] AR DOI 3; *see also* AR DOI 20 ("There remain at least three viable transportation alternatives for the residents of King Cove to obtain access to the Cold Bay airport: resumption of the hovercraft alternative that was developed in 2003, implementation of the landing craft described by the Aleutians East Borough utilizing the infrastructure built for the hovercraft, and a ferry operating from Lenard Harbor to King Cove.").

[108] AR DOI 3.

[109] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

[110] *Indigenous Envtl. Network v. United States Dep't of State*, 347 F. Supp. 3d 561, 583 (D. Mont. 2018), *appeals docketed*, No. 18-36068 (9th Cir. Dec. 21, 2018), No. 18-36069 (9th Cir. Dec. 21, 2018), No. 19-35036 (9th Cir. Jan. 14, 2019), No. 19-35064 (9th Cir. Jan. 29, 2019) (quoting *Kake*, 795 F.3d at 968); *see also Kake*, 795 F.3d at 969 ("The absence of a reasoned explanation for disregarding previous factual findings violates the APA. 'An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.'" (quoting *Fox*, 556 U.S. at 537 (Kennedy, J., concurring)).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 24 of 31

to address the previous finding that there are "viable, and at times preferable" alternatives to a road for King Cove is closely analogous to the agency conduct found to be impermissible in *State Farm*. In both cases, the agency's prior findings suggested that alternative means of achieving the agency's objectives existed; in both cases, the agency "did not even consider the possibility" of implementing the alternative means.[111] Furthermore, while the prior Secretary found that "construction of a road through the Izembek National Wildlife Refuge would lead to significant degradation of irreplaceable ecological resources," the Exchange Agreement does not address this prior finding or contain any discussion of the environmental impact of the road.

The Montana District Court recently analyzed a similar issue in *Indigenous Environmental Network v. United States Department of State*.[112] There, the court considered whether a 2017 ROD approving the Keystone Pipeline constituted an impermissible policy change in light of a 2015 ROD that had denied a permit for the project.[113] The court noted that the 2017 ROD "initially tracked the 2015 ROD nearly word-for-word," but then, "without explanation or acknowledgment, omitted entirely a parallel section discussing 'Climate Change-Related Foreign Policy

---

[111] *State Farm*, 463 U.S. at 48.

[112] 347 F. Supp. 3d 561 (D. Mont. 2018). This case is currently on appeal before the Ninth Circuit. *See supra* note 110.

[113] *Indigenous Envtl. Network*, 347 F. Supp. 3d at 582–84.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 25 of 31

Considerations.'"[114]  The 2017 ROD avoided the 2015 ROD's "conclusion that 2015 represented a critical time for action on climate change" with a "single paragraph" stating that "since 2015, there have been 'numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so.'"[115]  The court concluded that "this conclusory statement falls short of a factually based determination, let alone a reasoned explanation, for the course reversal."[116]  Rather, the court found that the agency had impermissibly "simply discarded prior factual findings related to climate change to support its course reversal."[117]  The Court finds the *Indigenous Environmental Network* court's reasoning persuasive.  The cases are comparable; indeed, the primary difference is that here, the Secretary did not provide even a "conclusory statement" acknowledging its policy reversal, but rather "simply discarded" its prior findings without any explanation.

Federal Defendants maintain that the Exchange Agreement constituted a permissible agency reversal.[118]  They contend that "[t]he Secretary understood the previous decision to reject the land exchange proposal due to possible impacts on

---

[114] *Id.* at 584.

[115] *Id.*

[116] *Id.*

[117] *Id.*  The district court accordingly "vacate[d] the 2017 ROD and remand[d] with instructions to provide a reasoned explanation for the 2017 ROD's change in course."  *Id.* at 591.

[118] Docket 65 at 25–26.

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 26 of 31

wildlife, but the Secretary came to a more humane conclusion — regardless of the potential environmental impacts that can be managed and minimized in cooperation with KCC, human life is more important."[119] There are two problems with this argument. First, the Exchange Agreement does not contain the explanation now articulated in the Federal Defendants' brief.[120] The Exchange Agreement does not explain the agency's "reversal of course as arising out of concern about economic and social hardships"; moreover, there is no language in the Exchange Agreement suggesting that the Secretary's reversal is the product of his rebalancing of the facts in light of new policy goals.[121] While a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," a court may not "supply a reasoned basis for the agency's action that the agency itself has not given."[122] Second, while *State Farm*, *Fox*, and *Kake* indicate that an agency may reverse course and may "rebalance old facts to arrive

---

[119] Docket 65 at 25–26.

[120] The *Kake* court held that the agency was entitled "to give more weight to socioeconomic concerns than it had in [an earlier decision], even on precisely the same record. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015); *see also id.* (indicating that an agency may "rebalance old facts to arrive at the new policy"). "*Fox* makes clear that this kind of reevaluation is well within an agency's discretion." *Id.* (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012)).

[121] *Id.* at 967 (quotation marks omitted).

[122] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 377 (2010) ("[A]n essential premise of [APA] review presupposes that the agency will establish its rationale at, or prior to, the time of its decision—not after."); *see also* Docket 81 (Order Granting Mot. to Strike).

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 27 of 31

at [a] new policy," they also make clear that an agency may not "ignore" or "discard" earlier factual findings without providing a reasoned explanation for doing so.[123]

The Exchange Agreement does not contain any acknowledgment that the Secretary's decision to enter into that agreement constitutes a fundamental change in agency policy. Instead, in entering into the Exchange Agreement, the Secretary reverses the previous policy of the DOI without any reasoned explanation for the change of course with respect to the existence of viable alternatives to a road. And, in entering into the agreement, the Secretary ignores the agency's prior determinations concerning a road's environmental impact on Izembek without providing any reasoned explanation for this change. The Court therefore finds that the Secretary's decision to enter into the Exchange Agreement constitutes an unlawful agency action as it is arbitrary and capricious under the APA.[124]

### 3. Remedy

Federal Defendants contend that should the Court find legal error as to the Exchange Agreement, the Court should allow additional briefing on the question of remedy.[125] Intervenor-Defendants contend that "[b]ecause this is a land agreement between the Secretary and an Alaska Native organization, the Court

---

[123] *Kake*, 795 F.3d at 967–69 (quoting *Fox*, 556 U.S. at 537 (Kennedy, J., concurring)).

[124] *See Kake*, 795 F.3d at 966. In light of this ruling, the Court does not reach Plaintiffs' other claims at this time.

[125] Docket 65 at 40.

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 28 of 31

should make every effort to follow the time-honored rule and resolve ambiguities in favor of the Native organization and allow the parties to remedy any insufficiencies found by the Court."[126]

The APA states that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[127] However, a court may decline to vacate an unlawful agency action "when equity demands."[128] "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[129] Here, the Secretary's failure to acknowledge the change in agency policy and his failure to provide a reasoned explanation for that change in policy are serious errors. And there is no indication in the record that there are any disruptive consequences that would result from the setting aside of the Exchange Agreement. The Court acknowledges that "[i]n appropriate situations involving contracts or consent decrees between Indians and non-Indians . . . the interpretation or definition of potentially ambiguous terms . . . should be construed

---

[126] Docket 66 at 32.

[127] 5 U.S.C. § 706(2)(A); *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184–85 (9th Cir. 2011).

[128] *Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)).

[129] *Id.* (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 29 of 31

in favor of the Indian's interests."[130]   Here, however, the Court's conclusion that the Secretary's decision to enter into the Exchange Agreement was arbitrary and capricious is not based on an interpretation of ambiguous terms in the agreement. For the foregoing reasons, vacatur of the Exchange Agreement is warranted.

Plaintiffs also seek an injunction along with the vacatur of the Exchange Agreement.[131]   The Supreme Court has held that "recourse to the additional and extraordinary relief of an injunction" is not warranted where "a less drastic remedy []such as partial or complete vacatur . . . [is] sufficient to redress [the aggrieved party's] injury."[132]   Plaintiffs do not explain why an injunction would be necessary in this instance.  Here, the vacatur of the Exchange Agreement should provide sufficient relief to redress Plaintiffs' injuries.

## CONCLUSION

In light of the foregoing, IT IS ORDERED as follows:

Plaintiffs' motion for summary judgment at Docket 50 is GRANTED as follows:

The Secretary's decision to enter into the Exchange Agreement with the King Cove Corporation on January 22, 2018 constituted an unlawful agency action in violation of the Administrative Procedure Act.   Therefore the Exchange

---

[130] *United States v. Gila Valley Irr. Dist.*, 31 F.3d 1428, 1438 (9th Cir. 1994).

[131] Docket 32 at 2.

[132] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

Case No. 3:18-cv-0029-SLG,  *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 30 of 31

Agreement is SET ASIDE and VACATED. Plaintiffs' additional request for injunctive relief is DENIED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 29th day of March, 2019 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:18-cv-0029-SLG, *Friends of Alaska, et al. v. Bernhardt, et al.*
Order re Motion for Summary Judgment
Page 31 of 31